Marine v. Houston, Texas Marine v. Houston, Texas Marine v. Houston, Texas Mr. Preheim, when you're ready. Good morning. Thank you. May it please the court. The Army Corps of Engineers was established... There seems to be an issue here about Article 3 standard, which you don't, neither party addresses, but it's jurisdictional and we have to address it. I'm having some difficulty in understanding how Weeks Marine has established at this point any injury which would satisfy Article 3 because it's not clear that it's going to even potentially lose any of these task orders as a result of the change in approach by the government in this area. That's right. With respect to the prejudice issue, and as we argued before the trial court... That's a threshold issue, right? That's right. I think that's correct. Weeks was never able to identify any harm as a result of the solicitation at issue here. Now, if you look at the... But there will be no other opportunity to raise any challenge should harm occur in the future, right? And in those circumstances, the courts have often allowed Weeks to have standing regardless. Well, that's not entirely correct. If Weeks did not win one of the initial contracts, Weeks could protest that decision. With respect to future task orders, it's... But how would a future task order, if they're all... Let's assume they're all assigned hereafter to the contracting officer's best friend who is with one of the companies and Weeks receives none of them, there would be no chance for Weeks to challenge that, right? With a few exceptions, if the task order exceeded the scope of the original contract, for example, or... But if they wanted to challenge it just on price grounds, we can do that much cheaper. Our equipment is a mile away. Theirs is a thousand miles away. That they could not challenge, right? That's correct. So in those circumstances, the federal courts will allow them standing at this point, right? I'm not certain that that's correct, Your Honor. Keep in mind that that, in essence, is simply a critique of IDIQ contracting, and that's a method of contracting... No, it's a question of whether or not they would... When the problem arises, it's kind of the Roe versus Wade problem, where the federal courts allowed standing even though it was already moot, the child had been born. I think the problem here, Your Honor, is that Weeks was never able to point to any aspect of the solicitation that would result in any likelihood of Weeks losing future task orders. I just gave you the potential hypothetical. Well, that's a hypothetical. That's purely speculative. Yes, but the point is at that point, they would not have a chance to raise any challenge. And in that instance, we allow the challenge at this point, right? That's correct. But let me make two points. First, the prejudice issue was addressed twice in the bid protest context, first as an element of standing, and then separately the court also considers an element of harm. I'll tell you what my problem is. I had the same concern that Judge Rader does, that if we were to deny standing here, that under the government's position, there wouldn't be any opportunity later on to bring a challenge. But I'm not sure that the government is correct about that, because while it's true that you can't challenge the task order allocation under the contract except on limited grounds, there's nothing in the statute to prohibit exactly the same kind of challenge being brought now at a later time when there's been injury. So I don't understand how the government can say that there isn't a right to bring this same challenge later on, as opposed to a challenge to whether the task orders have been allocated properly. Well, I believe that the FAR contains a prohibition against protesting task orders. Yeah, but my point is it wouldn't be a protest to the task orders, it would be a protest to the contract. The claim would be exactly the same claim that's being asserted now, a challenge to the contract, but a challenge to the contract brought at a later time when injury is established. I see your point. Assuming this court also has a prohibition against protesting the terms of a solicitation, but I suspect that under Your Honor's example, a protest in the terms of a solicitation at a later point after awards have been made, but I suppose that under your example, that that might not apply in that situation. Let me ask you, the statute 1491b1 gives the Court of Federal Claims jurisdiction to render judgment on an action by an interested party objecting to a solicitation for bids or proposals for a contract. Now, Weeks is objecting to the solicitation, right? That's correct. Why is Weeks not an interested party if Weeks isn't who is? What is an interested party in the pre-bid or pre-solicitation type of action that's contemplated by 1491b1? Well, even in cases where there is no sort of best value analysis to compare, so it was a contractor, for example, in a sole source scenario that wasn't given an opportunity to bid, we don't know what would have happened. There's sort of a necessary aspect of speculation. We don't know what would have happened if that contractor had been given a chance to bid. I mean, the statute seems to say that, quote, an interested party, close quote, can bring an action to challenge a solicitation, right? That's right. Who do you have to be or what do you have to show to be an interested party just to challenge a solicitation, which is what's happening here? I think two things. First, you have to show that there would have been some harm to you or substantial likelihood of harm. In other words, point to an aspect of the solicitation that's going to cause you harm or is somehow going to impede your ability to bid on these task orders, and I can give an example. Here, the Maytocket issue was grouped into four groupings, and the first grouping was limited to contractors with a hopper dredge, and there were certain projects in that group. Now, what if Weeks doesn't have a hopper dredge, and what if Weeks thinks it's irrational for a couple of those projects to be included in that grouping? So Weeks is saying, if they were moved to a different group, we could bid on those task orders. Well, that's harm, and it's harm that ties the company's business situation to the solicitation at issue. Now, obviously, also, part of that standard requires that you actually be a contractor, that you have the financial wherewithal to actually bid on these projects, the technical capability as well. Weeks does seem to have that. Yes, we haven't disputed that aspect of it, but it's the first part. It's the harm. So you're saying your view is the reason in your view that Weeks is not an interested party as contemplated by the statute is that it hasn't shown enough of a – it hasn't pointed to a specific economic harm because of the terms of this particular solicitation. That's correct. That's correct, a competitive or economic harm. And the theory is that because they are included under the contracts, and they are, right? I'm not sure what you mean by – you mean – They can potentially receive the task orders because they're part of the pool, right? That's correct. Weeks has said it expects to be part of the pool. So at this point, we don't know whether they're going to receive more or less as a result of this change in the approach to non-competitive bidding. That's correct. And what we're saying is Weeks needs to point to some aspect of the task order process that's going to impact its ability to compete here. That's going to harm its business, and it never did so. I wonder if we could get to the matters that were briefed. How do you meet the EFAR's provision? Certainly. With respect to EFAR 16.501, of course, that provision states that indefinite delivery contracts can be used if the time to procure the required services through normal selection procedures would cause an unacceptable delay. There has been an unacceptable delay in the past, and the Corps determined that there is likelihood of an unacceptable delay in the future. Keep in mind that – It relies on this 15 days and the 30 days, which is questionable as to whether that's an unacceptable delay. I would have thought that your argument – and you haven't made it – but I would have thought that the argument is that this indefinite quantity approach was beneficial and avoided delay because it allowed the contractor to do things in advance, which it otherwise would have to do in response to the solicitation. For example, get the required bond and establish its technical capabilities. I would have thought that that was part of what the concern is, but there's no mention of that in here. All you mention is the 15 days and the possible 30 days, which seems a little bit thin. Well, and I think your Honor is correct. That certainly is part of the benefit of the solicitation here, is that because contractors will have submitted much of their information in advance, it will be quicker, easier to issue task orders. I think your Honor is correct. But you didn't make that argument. I think it's certainly contained in the solicitation itself, and I believe we have stated while we focused on the 15 day and the 30 day, we did, I believe, state in our briefs that the solicitation enables the quarter to speed up the procurement process. Well, it's an unacceptable delay. Well, certainly that term obviously depends upon the circumstances of a given situation. But here, given that environmental windows compress the time period for dredging in much of the region, for example, hopper dredges are limited to a December through March, a four-month time period, given that we know delay can occur because there's a limited contractor pool, because of the inability of contractors to adequately perform, and because of unplanned dredging events, given all of those factors and given that we know that the solicitation will reduce delay by between 30 and 45 days, is it irrational for the court to want to speed up the procurement time? Of course not. Is it irrational for the court to want to have flexibility in scheduling work? Is it irrational to want to reduce the need for emergency procurement? Of course not. With respect to the first statutory violation alleged by WEEKS, which is 10 U.S.C. 2304A, here it's clear that the solicitation on its face considers non-price factors. WEEKS argues that you haven't shown any example of when a project suffered unacceptable delay. Should we require the agency to first suffer the unacceptable delay before making changes to their procurement process? No, of course not, Your Honor. In fact, just last week, this court, in a decision issued- Che consulting. Yes, Your Honor. The Che consulting case held that an agency need not identify previous failures in a procurement method before acting to avoid those failures. But even if there were a requirement, there is evidence in the record here of previous failures. Even the trial court, in fact, recognized the difficulties the agency encountered in recent years with respect to at least one project. And there's also a reference to page 82 of the appendix to acceptance of mediocre quality work in the past. This regulation's been repealed, right? That's correct. And effective January of last year? Yes, that's correct. What's the consequence for us of that repeal? Does that remove the issue from the case? I'm not sure it removes the issue from this case, but obviously if the court issued a different solicitation in the future, I think it would. You mean the existing solicitation has to be judged under the preexisting law? I think that's right, Your Honor. Further, with respect to the issue of past performance, Weeks has asserted in the trial court held that a responsibility determination under the FAR should suffice. Here, though, the solicitation, the analysis of past performance is significantly different from a responsibility determination. Indeed, the FAR recognizes that this is separate from a determination required under FAR 9.1. Under a responsibility determination, you can be a responsible contractor, but never have worked on similar projects to the one at hand. FAR 9.104-1 states that a prospective contractor shall not be determined non-responsible solely on the basis of lack of relevant performance. Isn't this really just about price? No, it's not, Your Honor. In fact, the trial court apparently didn't believe that the court would actually consider non-price factors. There's absolutely no evidence in the solicitation. There's no support in the record for that interpretation of the solicitation. What the trial court cited to, the trial court said, well, the court intends to notify successful offerors within as little as two hours of receipt of proposal, so how can the court really be considering non-price factors? That's not what the solicitation says. What it says is that if, after review of proposals, it's clear who the successful offeror is. But once you've got your initial contractors, and they're all people you've worked with for decades, isn't the individual task order going to be a price consideration? You know they're all competent, and they're all good performers, or they wouldn't be in the working group anyway. Well, no, because the working group, to qualify for the working group, you merely have to have a technically acceptable proposal, which is basically you have to have the equipment to be able to do the job. To qualify, with respect to past performance, though, each task order is a separate analysis, obviously. Each project is a different analysis. We know that dredging has different... But I just repeated pretty clearly the trial court's rationale, right? I think the trial court's rationale was that he didn't believe that the court would really consider past performance, and our point is that there's simply nothing in the record to make that interpretation of the solicitation here. Let's hear from Weeks Marine, Mr. Freheim, and we'll restore your three minutes of rebuttal. Could you give Mr. Payne an additional three minutes, should he need to use it? Then the time will be pretty even. Thank you, Your Honor. Judge Rader, if I may comment first on your last point, I believe it really is all about price. You have to understand, I want the court to understand, that what we're talking about here is about the most basic form of construction contracting, the excavation of soft material from a channel, maintenance dredging, it's called, and shore protection work, which is pumping sand onto a beach, essentially. This has been procured from time immemorial on sealed bidding, and the awards have always been made to the low bidder. Weeks has been very successful. Yes, Your Honor. So my problem is, where's the injury here? Because you may be just as successful in the future as you've been in the past. I've looked at the record here, and it seems to me that it's really speculative to say that Weeks is going to be injured by this new approach to the contracting. Well, we don't know, Your Honor, but here's what we do know. You're absolutely correct that Weeks and other companies have thrived under the business model of sealed bidding and the low bidder, and they've built their companies and their marketing plan that way. What the Corps of Engineers has done here is it's taken the entire industry that operates in the southeastern region of the United States for the next five years, and as Mr. Preheim has admitted, everyone's going to get one of these master or umbrella MATOC contracts. All the same players, 12 or 14 of them, are going to be still in the game. Okay, so why then is Weeks likely to be disadvantaged by the new system? Because under the new system, the Corps of Engineers is reserving the right and calling it contracting by negotiation. So the award no longer on a task order by task order basis has to be made to the lowest price. There's a certain degree of subjectivity that can be introduced. Now, I believe Judge Rader was correct in reciting what the lower court said, that aren't all of these companies basically good performers, and you really aren't going to have problems like that. I think that's right. There's very, very few instances of terminations for default in the dredging industry. I don't understand where the injury comes from. Why is it less likely that Weeks is going to be successful under this new system? Because they can control their own destiny in having low bids at which they can make money. They can't control their destiny when the Corps of Engineers is going to introduce subjective evaluations on things other than price. But why aren't those justified? A hurricane is about to hit. They only have so many days to get the dredges to Charleston, South Carolina, to be in place. And why shouldn't they be justified in moving quickly, even saving 15 days if that's all, to get someone there in time to handle the emergency? They can do that, Your Honor. They do that now. Remember, one of the things that's been recited in this administrative record is that the Corps of Engineers has excelled in its program execution in recent years. That included the worst hurricane season on record of Katrina and Wilma and Dennis and so forth. The way the Corps of Engineers handled it then and has always handled it is if there is what could be called an emergency situation, you have under the Section 6 compelling urgency rules an expedited procurement. Contrary to what is suggested by the government, these contracts that were emergencies were not awarded for the most part on sole source basis. They were awarded on expedited competition. So the Corps goes out with a five or a ten-day procurement and said, look, we've got a problem in Wilmington or we've got a problem in Charleston. The closest crane gets it. Probably that's right, Your Honor. Many times there is competition, however, and there are several dredging contractors who are in a position to meet that emergency. But it's worked very well under the current system. Under the current system, what you characterize as the current system, pre-existing system, there's a solicitation. Does the contractor then have to secure a bond and establish its technical qualifications? He does have to secure a bond, although that's pretty routine for those that are established and all of these companies are. He does not have to establish his technical qualifications because the current practice is sealed bidding for the most part. Even if this negotiated system is put into place, Your Honor, one of the things that's interesting about it is there still is not going to be any examination of technical qualifications. I guess what I'm getting at is doesn't the new system enable the contractors to get ready in advance in a way that perhaps they weren't able to get ready in advance before? No. As a matter of fact, Your Honor, in some ways it's going to make things worse for them because if the core is right, and I'm not sure that it is, that it can compress the time from the issuance of the solicitation to performance beginning, that's going to create a big problem for most dredging contractors because allocation of their equipment is a difficult situation. You have a lot of work to be done, a limited number of contractors, and a limited number of equipment. There are things that go on that are beyond their control, like the weather and mechanical breakdowns of their equipment. When they're performing one job, they're usually looking ahead as to which job or jobs they want to bid in the future so that they can allocate their equipment. Of course, they hope that things go well, that there aren't any unforeseen weather problems or unforeseen mechanical problems. That's the sort of planning ahead they do, the allocation of equipment. One of the things that the Corps of Engineers said in this acquisition plan that's the most disturbing, that one of its objectives here is to assert command, control, and orchestration of the dredging industry back to the government. I would suggest respectfully to the Court that that's not the role of the Corps of Engineers. We're talking about private industry here, and they have a right to allocate their equipment in the way they see fit. The Corps argues that this involves issues of national security, keeping the waterways open for military ventures as well as others. Why doesn't that give them a wider latitude? Well, if that were a problem, perhaps it would. But one of the things that the lower court found here, and this permeates the lower court's findings, is that there was a total lack of empirical data in the acquisition plan and the administrative record to support any of these contentions. Not a single example of where... Wait a second. I don't understand where that obligation comes from. I thought our cases made pretty clear that it's your burden to bring in this evidence, and that's one of the things that's troubling about the Court of Federal Claims' opinion here. It's as though the government has to produce the evidence in connection with the solicitation. That's got it backwards. The obligation's on you to prove that the solicitation violates the law or is arbitrary or whatever. It's not that the government has to, as part of the solicitation itself, prove its case. Well, I think that's right, Your Honor. But when the government facially says, we're going to use evaluation factors other than price, that does seem to satisfy the statutory requirement in the Competition of Contracting Act. But then you have to look beyond that and say, okay, on what basis do you come to the conclusion that you're going to need evaluation factors other than price? And that's when you get to the rational basis side of this. And the Court said that essentially the Corps of Engineers just can't... The rational basis is pretty low standard. They have told us they're going to save $1.5 million over just two years. They've given us the national security argument. They've given us some basis. Why isn't it rational? Because the lower court found that there has to at least be some discussion of it in the administrative record, something to show a nexus between that conclusion and some information that the agency has. Remember, I understand the burden that Your Honor has brought up. That's back to my colleague's excellent point, that the burden's on you, not on the government. Well, in the first instance, I would argue that the burden's on the government when it comes up with an acquisition plan, especially one like this. It's such a great departure. Why haven't they met the threshold of a rational basis? Isn't it a very high standard? Because they did not, in the finding of the lower court, Your Honor, include virtually any empirical data. Well, the 15-day savings was probably rational. Well, except that the court said that that was highly speculative. You're talking here about sealed bidding where you have a 15-day synopsis period followed by 30 days from the issuance of the solicitation to the award of the contract. When you say empirical data, you're saying, and I guess this is what the Court of Federal Claims felt, that there should have been some discussion in the determination document by the court that set forth why it was doing this. There should have been specific examples cited of we had a problem during Hurricane Katrina in a particular area and we couldn't get a dredge there soon enough. Is that the sort of empirical data that you're saying should have been included? Yes, that's one of the examples, and the other one is just some discussion of it at all. But we just went over that a second ago in anticipation of this argument. The Che contracting case says we don't have to wait for the misstep to occur before we can correct it. I agree with that, and I understand that that's what the case said. But remember, that's not what Judge Wheeler ruled. Judge Wheeler didn't find that there had to be a historical record of failures to satisfy this. What Judge Wheeler in the lower court said in the Che case was that you're to consider all relevant factors impacting the procurement, set forth findings supporting that decision, and provide a full and reasoned explanation. He found that in the Che consulting case that was done. But contrary to that, he found in the Weeks case that that was not done. But he found it was done in Che when he went out and gave the government an opportunity to come in with additional evidence. We said in our Che opinion, we're deciding this case on the basis of the original record, I think. That's as I understand the way our Che opinion went. Our opinion just looked at the original record and said it wasn't necessary to bring in this additional material, and we're not going to consider it. I understand that. That point does seem to be pertinent to what we have here. Yes, but remember, the lower court and the judge said that in 30 years of procurement experience that he had had, that this was just about the poorest acquisition plan he had ever seen. He emphasized over and over the total absence of support. He wasn't looking for a way to prohibit the Corps of Engineers from doing this, but he just expected to find a modicum of support because he recognized that this was a very unusual thing that was being done here. Taking an entire industry for an entire region of the country for five years, and saying we're not going to do business the way you want to do business, and the way business has been successfully done before and we've excelled in, we're going to change it to another system. Let me ask you one question. The 2304 issue, the government is required to solicit CO bids if the award were made on the basis of price and other price-related factors. The government is saying here we're going to consider non-price-related factors, and that's stated in the solicitation. I was trying to understand, was the Court of Federal Claims saying I don't accept that the government is really going to consider other factors? The Court of Federal Claims seemed to be saying yes, that's what the solicitation says, but I, the Court of Federal Claims, think that really it's not going to. Am I reading it correctly? No, I can understand where you come to that conclusion. I think the way I would put it, Your Honor, is that the lower court said the Corps of Engineers hasn't given us a rational basis to support that that's what they're going to do. That's difficult. Remember, we're talking in the first instance here about the award. What we protested was the solicitation of these umbrella MATOC contracts. In the umbrella MATOC contracts, technical capability is satisfied by owning a dredge. Past performance is basically whether or not you've been in business before. Everyone's going to get one of the MATOC contracts. They say that most of the task orders are going to be done on the basis of lowest price technically acceptable. I guess the problem I'm having, just focusing for a minute on the 2304 issue, because there's the 2304 issue, the rational basis issue, and then this standing question. But on the 2304 issue, I don't see much of an issue there is what I'm saying. I'm sounding redundant. But it does say on its face we're going to consider non-price factors. Isn't that the end of it? Facially, yes, Your Honor. I think they've satisfied what the statute requires. But I would then go on to say that that isn't enough. Now you examine was there a rational basis for that conclusion. Doesn't the case then come down to whether the government established a rational basis for the structuring of the procurement? Yes. I believe it does, Your Honor. I think that is more of what the case is about. And I think the lower court dealt with that in considerable detail. And that's why you have so many findings. You're asking us to assume that in the future they're going to make price the only consideration. That's basically what you're asking us to do. Now maybe five years from now, if every one of these things is awarded based on price, then you might have a case. But right now, you're just asking us to speculate that the government's lying when it says that it's going to consider factors other than price. Not lying, Your Honor. But they've told you, they've told us in the acquisition plan and the administrative record that that's what they're going to do. They've said most of these, it's anticipated that most of these will be lowest price, technically acceptable, which is virtually to the same as sealed bidding. There's nothing to prevent the Corps of Engineers now from on an individual procurement by procurement basis justifying negotiations. What did they say that most of them are going to be awarded solely on price? I think it was A-128 or A-43 of the appendix. 128? Is that the right one? I've got to get my hands on it quickly. A-43. The way I'm reading it, A-43? On 126, they say past performance is considered significantly more important than price. In A-43 paragraph 4B, task orders will be awarded on a competitive basis using primarily low price technically acceptable procedures. So that means since all of these contractors are technically acceptable, it will be the lowest price. Is that really true? If Katrina hits, the technical requirement may be who has the nearest crane, right? If you don't have the nearest crane in that example, Your Honor, you're probably not submitting a proposal. On the general projects, which are well known and well identified in advance, the Corps lays out its dredging program a year in advance. The technical proposal in these cases is not complicated. It's one of the greatest concerns I have about what they're doing here. When you think, or at least when I think, about contracting by negotiation, one of the principal evaluation factors usually is technical merit and technical approach. One thing we can be sure of here, Your Honors, the Corps of Engineers does not intend to actually negotiate these negotiated procurements as they're called. They're not going to open up discussions. They're not really going to evaluate technical proposals because there's no technical proposal submitted. You're on the dredging, you dredge it. You mean on the task orders? Yes, and even on the- To go to the point that Judge Dyke made, that may well prove to be the case, but at this point, don't we have to take what we have at face value? Well, but except, Your Honor, even on the solicitation we're challenging, the award of the master MATOC contracts, there's no technical proposal. You have a very unusual situation here of using FAR Part 15, contracting by negotiation, but you're not really using it for what it's intended, to negotiate contracts, open up discussions when necessary, and evaluate technical merit and technical proposals. It's being used as a way to create this vast, closed shop. Can I ask you, because your time is running short, just a housekeeping problem, but it's something we run into from time to time. None of the briefs, yours or the government's, are marked confidential, yet we have a confidential appendix that's marked confidential. Looking down the road to writing an opinion, whether it affirms or reverses or vacates or whatever, what is confidential about this that can't be discussed? I mean, it seems we've had a pretty free-flowing discussion here, and nobody's raised their hand and said, don't say that. So can we consider everything on the table so to speak? I believe so. I think the only thing that might not be, and I would defer to government counsel for this, is there may have been some discussion of the Corps of Engineers' anticipated estimates for future dredging projects. But that's not really something we've discussed anyway, and that may be the only thing that's truly confidential in that document. Final comment, Mr. Payne? Just, Your Honor, one of the harms to WEEKS and to any dredging contractor, and most of them do object to this procurement, is that dredging contractors use the information that's available in sealed bidding, which is the disclosure of all of the bid prices in the government estimates, to plan their bidding strategy for the future. When you go to contracting by negotiation, the government estimate is generally not disclosed, and certainly the pricing of the other competitors is not disclosed. It will change the whole ballgame for the industry, and it will cause probably prices to go up, because contractors are pretty well able to gauge how they should compete in the future under the present system, and that's why the Corps of Engineers has accelerated. You made your point there. Thank you. Thank you, Your Honor. Mr. Praheim, we gave you back three minutes. Thank you, Your Honor. Just a few points. Could you address the confidentialities? The only things in the appendix that are confidential, there's a listing of projects that have some estimated price information, and there are two or three charts that have some information about specific individual contractors. That's the only thing in here that's confidential. A43, Mr. Payne's point about the language. Could you address that? Yes. Actually, if you look at page A114, that's the actual solicitation itself. It says at the bottom under D, the second sentence states, the government shall always consider past performance, including quality, timeliness, and cost control, equipment availability, and equipment capability as evaluation factors. What's meant by the language on A43? I think my point, Your Honor, was that if there's any inconsistency with the language, the court should look to the solicitation itself, and what the solicitation says the court will do. What this says on A43 is that task orders will be awarded on a competitive basis, using primarily low-priced technical, But it also goes on to say selection criteria will be safety record, small business subcontracting, availability, et cetera. That's correct. Graham, one question I had. Mr. Payne focused on this, what I'll call this command and control issue, and this was obviously something that bothered the Court of Federal Claims. The Court almost seemed to speak in Orwellian terms about this. What does that statement mean, command and control? What it means, Your Honor, is that, like many government contracts, we're asking contractors to perform certain tasks, and if the current system doesn't allow, if the court has determined the current system somehow impedes that ability, it's revising that system. Yes, we are asking contractors to do things. That's what we always do in government contracting. That's nothing unusual. There's no sort of nefarious rationale behind the procurement here. If I could just make one or two points. Counsel said that dredging is simply pumping sand on a beach. The reality is that some companies, even if that's true, some companies pump sand better than others, and the court is entitled to consider that. But, in fact, we know that dredging is more than pumping sand. We know that it involves huge pieces of equipment operating in shipping channels that are used by recreational, commercial, as well as military vessels, and we know that productivity is important. At page 76 of the appendix, the court explained that the longer it takes to dredge, the longer a dredge is on site, and the longer it presents a hazard to safe navigation. This is more than simply moving sand, as was suggested. Do you have a final comment for us? Only that we respect the request of the court to reverse the trial court's decision. Thank you. Thank you. Our final case this morning is Lenko Racing versus...